**COURT OF APPEALS
DECISION
DATED AND FILED**

**July 31, 2026**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2025AP1727**

**STATE OF WISCONSIN**

Cir. Ct. No. 2024CV926

**IN COURT OF APPEALS
DISTRICT IV**

---

ERICK HALLICK,

    PLAINTIFF-APPELLANT,

  V.

PATRICK HULL, CHRISTINA HULL,
GREENPOINT REAL ESTATE DEVELOPMENT FUND LLC,
AND GREENPOINT ASSET MANAGEMENT LLC,

    DEFENDANTS-RESPONDENTS.

---

       APPEAL from an order of the circuit court for Dane County: ANN M. PEACOCK, Judge. *Affirmed*.

       Before Graham, P.J., Blanchard, and Taylor, JJ.

       ¶1    BLANCHARD, J. Erick Hallick obtained a money judgment against parties that include Patrick Hull, Greenpoint Real Estate Development Fund LLC, and Greenpoint Asset Management LLC (collectively, "the Debtors").

The judgment arose out of disputes related to investments that Hallick made with the Debtors and others. Hallick and the Debtors entered into a "Confidential Judgment Payment Agreement" ("the Agreement"). Under the Agreement, the Debtors committed to pay Hallick a fraction of the judgment amount, $5 million. Hallick agreed that, if the Debtors paid him the $5 million in full, he would release them from various claims and demands that Hallick had made or may make in the future, including any claim for the Debtors' share of liability under the judgment. One Debtor, Greenpoint Real Estate Development Fund LLC (individually, "the Fund"), eventually took the position that, under the Agreement, Hallick released his right to claim an ownership or membership interest in the Fund, starting when the Debtors paid him the $5 million in full. In response, Hallick filed this civil action in circuit court against the Debtors, asking for a declaration that the Agreement did not have the effect of eliminating his interest in the Fund.

¶2 Both sides moved the circuit court for summary judgment. The court denied Hallick's motion and granted the Debtors' motion. The court concluded that the Agreement unambiguously establishes that, as a result of the Debtors' payment to Hallick, the Debtors were released and discharged from any claims that Hallick might have against them related to his interest in the Fund.

¶3 We conclude that the Agreement on its face, including its all-encompassing release language, unambiguously bars Hallick from making a claim to enforce an interest in the Fund. The scope of the Agreement is sufficiently broad to preclude the present action, because it extinguishes all claims related to Hallick's transactions with the Debtors that occurred before the effective date of the Agreement. This includes any claims related to his investment interest in the Fund, such as the transactions that created his interest in the Fund. Accordingly, we affirm the circuit court's grant of summary judgment in favor of the Debtors.

## BACKGROUND

¶4      For purposes of this appeal, there is no dispute about any of the following facts, which are derived from the summary judgment materials that the parties submitted to the circuit court.

*Events Predating the Agreement*

¶5      The Fund is a Wisconsin limited liability company.  It is primarily in the business of buying and developing real estate to create rental units.  It is managed by Greenpoint Asset Management LLC (individually, "the Management LLC").  Hull is the sole member of the Management LLC and a managing member of the Fund.[1]

¶6      In 2013, Hallick invested a total of $2,970,000 in the Fund, based on advice from Patrick Hull and others, which gave Hallick a membership or ownership interest in the Fund.  At around the same time, Hallick also invested in related entities: $6,875,000 in Greenpoint Tactical Income Fund LLC; $3,125,000 in Greenpoint Fine Art Fund LLC; and $1.5 million in Greenpoint Global Mittelstand Fund I LLC.

¶7      In 2017, parties that included the Debtors did not respond to requests by Hallick that he be allowed to redeem, withdraw, and liquidate his interests in

---

[1] Christina Hull is married to Patrick Hull.  She is a respondent in this appeal, but she was not named as a party to the Agreement that is central to the appeal.  Hallick's complaint includes a count claiming entitlement to Christina Hull's martial property based on the liability that could be attributed to Patrick Hull in this case and any resulting damages awards. *See* WIS. STAT. § 806.15(4) (2023-24) (addressing lien of judgment in the context of a married judgment debtor); WIS. STAT. § 766.55(2) (addressing obligations of spouses in various contexts).

All references to the Wisconsin Statutes are to the 2023-24 version.

entities that included his interest in the Fund. Later that year, Hallick filed a civil lawsuit against parties that included the Debtors, requesting that the circuit court order the dissolution of the Fund and related entities, and also that the court appoint a receiver.

¶8      All of the parties to the 2017 lawsuit stipulated to submit the dispute to arbitration. Hallick formally initiated an arbitration in February 2018, naming the Debtors and 15 other entities and individuals as respondents. Hallick alleged securities fraud, various forms of misrepresentation, breach of fiduciary duty, negligence, theft, and unjust enrichment. As relief, Hallick sought various forms of monetary damages, his attorneys' fees, dissolution of entities that included the Fund, and "the divesture of the Respondents' respective interests" in various entities, including the Fund.

¶9      In April 2019, as a result of a mediation within the arbitration proceedings, the parties, including the Debtors, entered into a settlement agreement. Under the settlement agreement, the respondents, including the Debtors, were obligated to pay Hallick $14 million by July 21, 2019. Hallick agreed that, if this payment were made in full, he would surrender his interests in multiple entities, including the Fund, in what the settlement agreement described as an "equity transfer." But the respondents, including the Debtors, failed to pay Hallick the full $14 million required under the settlement agreement. Therefore, Hallick was not required to surrender his interest in the Fund through the equity transfer contemplated in the settlement agreement.

¶10     Hallick initiated a second arbitration in September 2020, which resulted in an arbitration award, in the amount of $13,625,000, in Hallick's favor against parties that included the Debtors. Hallick successfully petitioned the

4

circuit court to confirm the arbitration award, and the court issued a civil judgment in the same amount.

*The Agreement and Later Events*

¶11    This brings us to the Agreement central to this appeal.  It is solely between Hallick and the Debtors; none of the other entities and individuals involved in the earlier litigation and arbitrations are parties to the Agreement.  The Agreement became effective on June 1, 2021.  As noted, it is titled "Confidential Judgment Payment Agreement."  Broadly summarized, it establishes obligations on the parties to allow the Debtors to satisfy their share of the liability for the $13,625,000 judgment by paying Hallick $5 million.[2]

¶12    More specifically, the Agreement obligates the Debtors to pay Hallick the $5 million on a payment plan, with an end date of January 31, 2022.  The Debtors were also required to "release and discharge" Hallick from any of a specified set of claims and other actions that they might make against Hallick, although those release provisions are not directly at issue in this appeal.

¶13    Most directly at issue is a lengthy, corresponding paragraph in the Agreement under which Hallick agreed that, as soon as the Debtors paid Hallick the promised $5 million in full, he would release the Debtors from a broadly defined set of historical and future claims against them.  We will refer to the pertinent portion of this text as "the Hallick-release paragraph."  In the course of

---

[2] Hallick states that he continues to pursue collection for the balance of the judgment from other persons and entities.

the discussion below, we quote and analyze the Hallick-release paragraph, along with other pertinent language in the Agreement.

¶14    The Debtors timely paid Hallick the $5 million required under the Agreement, and he released the judgment against them.

¶15    In the fall of 2022, the Fund sent Hallick a package of tax-related information that treated the $5 million payment as a final distribution to him of his interest in the Fund, indicating that, with this payment to Hallick, his interest in the Fund was terminated under the Agreement.  In response, Hallick questioned this treatment of his interest.  The Debtors did not reply to Hallick's inquiry.

¶16    In March 2024, Hallick filed a ten-count civil action against the Debtors in circuit court, alleging in substance that the Debtors were misinterpreting the Agreement to improperly deprive him of his interest in the Fund.  The circuit court granted the Debtors' motion to dismiss four of the counts in the complaint on grounds not pertinent to the issue in this appeal.[3]  This left six undismissed claims: a declaration that Hallick retained his interest in the Fund; conversion of Hallick's interest in the Fund; unjust enrichment related to Hallick's investment in the Fund; "money had and received," based on Hallick's investment in the Fund; spousal obligation; and breach of the Agreement through the failure to disclose to Hallick that the Management LLC had received money from an entity.  We put to the side the last claim about the failure to disclose the

---

[3] The four claims that did not survive the motion to dismiss were: breach of fiduciary duty; breach of the Fund's operating agreement; breach of the duty of good faith; and the right to inspect the Fund's records and an accounting.  Hallick does not raise any issue about the circuit court's dismissals of these four claims, and therefore we do not address them.

Management LLC's receipt of money.[4] The five other claims that survived the court's ruling on the motion to dismiss all depend on the premise that the Agreement does not deprive Hallick of his interest in the Fund. Most pertinent here, Hallick requested that the court declare that his interest survived the Agreement and that he is entitled to continuing cash distributions from the Fund.

¶17 Hallick moved for summary judgment in his favor on the remaining claims. Hallick argued that, under the unambiguous terms of the Agreement, he did not surrender his interest in the Fund upon his receipt of the full $5 million.

¶18 In the Debtors' motion for summary judgment, they contended that the Agreement is unambiguous in establishing that, when the Fund gave Hallick the full $5 million, this represented "the value of his investments," and as a result, he "has no further rights" of any kind to enforce against the Debtors regarding the Fund.

¶19 The circuit court denied Hallick's motion for summary judgment and granted the Debtors' motion for summary judgment. This was based on the court's conclusion that the Agreement "effectively strips Hallick of his right to make a claim or demand related to any agreement or transaction involving [the Debtors] which occurred before the June 1, 2021 Effective Date of the" Agreement, or related to the money judgment for $13,625,000, which includes

---

[4] Hallick does not argue on appeal that the circuit court erred in dismissing on summary judgment his claim that the Debtors breached the Agreement by failing to disclose to Hallick that, in May and June 2023, the Management LLC had received $17,590.46 from an entity identified as a "nonparty" to the Agreement, allegedly contrary to Agreement. The court granted summary judgment on this claim based on an apparently sound rationale that is, in any case, unrelated to the only issue that Hallick raises in this appeal, and we do not refer further to this claim.

Hallick's ownership interest in the Fund that started in 2013. On this basis, the court dismissed each of the remaining counts in Hallick's complaint.

## DISCUSSION

¶20 Hallick argues that the circuit court erred by not interpreting the Agreement as unambiguously requiring summary judgment in his favor, because the Agreement does not affect his interest in the Fund. The Debtors argue exclusively that the Agreement is unambiguous in establishing that Hallick may not claim an interest in the Fund as a result of the Agreement. Hallick also argues in the alternative that if the Agreement is ambiguous, the trier of fact needs to consider evidence extrinsic to the terms of the Agreement in order to resolve the ambiguity, and therefore genuine issues of material fact preclude summary judgment in favor of the Debtors. We conclude that the Agreement is not ambiguous on this issue. Therefore, we do not address Hallick's alternative argument based on extrinsic evidence that he contends creates triable factual issues.

### I.     Legal Standards

#### A. Summary Judgment

¶21 We review de novo an order granting a motion for summary judgment, applying the same methodology that circuit courts apply. *See **Green Spring Farms v. Kersten***, 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987). If a claim for relief has been stated based on the pleadings when we take as true all facts pleaded by the plaintiff, the remaining issue is whether any genuine issues of material fact exist when the correct legal standards are applied. ***Id.*** at 315-17. Summary judgment is appropriate only "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2). A factual dispute is genuine if "a reasonable jury could return a verdict in favor of the nonmoving party," and the dispute is material if it could affect the outcome of the trial under the applicable legal standards. *See Schmidt v. Northern States Power Co.*, 2007 WI 136, ¶24, 305 Wis. 2d 538, 742 N.W.2d 294. "[I]f more than one reasonable inference can be drawn from the undisputed facts, summary judgment is not appropriate." *Id.*, ¶47.

### B. Contract Interpretation

¶22 "A release is to be treated as a contract." *Peiffer v. Allstate Ins. Co.*, 51 Wis. 2d 329, 336, 187 N.W.2d 182 (1971) (citing *Nelson v. Boos*, 7 Wis. 2d 393, 96 N.W.2d 813 (1959)); *see also American Nat. Prop. & Cas. Co. v. Nersesian*, 2004 WI App 215, ¶14, 277 Wis. 2d 430, 689 N.W.2d 922 ("[A] settlement agreement is a contract and is governed by the traditional requirements for contracts."). "Accordingly, the interpretation of a settlement agreement is a question of law reviewed independent of the circuit court." *American Nat. Prop. & Cas. Co.*, 277 Wis. 2d 430, ¶14; *see also Huml v. Vlazny*, 2006 WI 87, ¶13, 293 Wis. 2d 169, 716 N.W.2d 807 (treating issue of whether parties to settlement agreement in civil action "intended it to encompass [a criminal] restitution judgment" as an issue of "[c]ontract interpretation" that is reviewed de novo); *Town Bank v. City Real Estate Dev., LLC*, 2010 WI 134, ¶32, 330 Wis. 2d 340, 793 N.W.2d 476 (determining whether the terms of a contract are ambiguous on a pertinent topic presents an issue of law, which is subject to de novo review on appeal).

¶23 "The lodestar of contract interpretation is the intent of the parties." **Huml**, 293 Wis. 2d 169, ¶52. "In ascertaining the intent of the parties, contract terms should be given their plain or ordinary meaning." **Id.** "If the contract is unambiguous, our attempt to determine the parties' intent ends with the four corners of the contract, without consideration of extrinsic evidence." **Id.** But when a contract is ambiguous on an issue, and reliance on extrinsic evidence does not remove all material issues of genuine fact, then interpretation of the contract presents issues of fact to be resolved by the finder of fact at a trial. *See Town Bank*, 330 Wis. 2d 340, ¶32.

¶24 "[T]he best indication of the parties' intent is the language of the contract itself," because this is the language that "the parties 'saw fit to use.'" **Id.**, ¶33 (quoted source omitted); *see also **Maryland Arms Ltd. P'ship v. Connell***, 2010 WI 64, ¶22, 326 Wis. 2d 300, 786 N.W.2d 15 ("The primary goal in contract interpretation is to give effect to the parties' intent, as expressed in the contractual language." (internal quotation marks and quoted source omitted)). "[I]t is well established that an actual 'meeting of the minds' is not a prerequisite to an enforceable contract," **Kernz v. J.L. French Corp.**, 2003 WI App 140, ¶20, 266 Wis. 2d 124, 667 N.W.2d 751, but instead contract terms are usually "judged by an objective standard, looking to the express words the parties used in the contract." **Management Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.**, 206 Wis. 2d 158, 180-81, 557 N.W.2d 67 (1996).

¶25 If a contract is ambiguous on the pertinent issue, then the extrinsic evidence that should be considered includes all of the admissible, relevant evidence involving "'the surrounding circumstances,'" taking into account "'factors occurring before and after the signing of an agreement'" and "'all related

documents of the parties.'"  ***Kernz***, 266 Wis. 2d 124, ¶10 (quoted sources omitted).

¶26    At times in his briefing on appeal, Hallick acknowledges legal principles that we have just summarized, such as that releases are to be interpreted in the same manner as other types of contracts.  Yet, at other places, Hallick quotes isolated statements by our supreme court in a possible attempt to suggest that disputes over the interpretations of releases to settle civil disputes in particular are to be treated as less susceptible to potential summary judgment than are disputes over interpretations of other types of contracts.  *See **Brown v. Hammermill Paper Co.***, 88 Wis. 2d 224, 276 N.W.2d 709 (1979); ***Pokorny v. Stastny***, 51 Wis. 2d 14, 186 N.W.2d 284 (1971); ***Plummer v. Leonhard***, 44 Wis. 2d 686, 172 N.W.2d 1 (1969).

¶27    As we now explain, a review of this precedent reveals that the quotations that Hallick relies on could be misleading when read in isolation, because these opinions do not necessarily stand for the proposition that special rules apply to the interpretation of releases to settle civil actions.  Further, even if these opinions could stand for that proposition, our supreme court has made statements, since it issued the earlier opinions, that preclude reliance on its earlier opinions for that proposition.  *See **Fritsche v. Ford Motor Credit Co.***, 171 Wis. 2d 280, 301, 491 N.W.2d 119 (Ct. App. 1992) (when rules stated by our supreme court are inconsistent, this court applies the most recently stated rule).

¶28    We interpret ***Brown***, ***Pokorny***, and ***Plummer*** to explain that, just as when courts interpret other types of contracts, if a court determines that a release is on its face ambiguous on such material issues as a possible intent to limit the scope of the release, then those issues are to be decided by the fact finder at trial.

*See* **Brown**, 88 Wis. 2d at 231-35; **Pokorny**, 51 Wis. 2d at 23-24; **Plummer**, 44 Wis. 2d at 691-92. That is, this case law emphasizes that summary judgment is not appropriate when the intent of the parties to a release, including intent about the scope of the release, is not clear from the face of the release. *See, e.g.*, **Brown**, 88 Wis. 2d at 231-32, 238.

¶29 At the same time, in references that Hallick now does not discuss, the court in each opinion also appeared to at least recognize that—again, as with the interpretation of other contracts—issues such as the scope of a release may be decided by a court on summary judgment if the pertinent terms of the release permit only one reasonable interpretation. *See* **Brown**, 88 Wis. 2d at 235-36 (noting that some releases can be understood to be "true general release[s]," but emphasizing that the releases in that case were not so worded); **Pokorny**, 51 Wis. 2d at 24 (leaving some cases "for the court" to decide); **Plummer**, 44 Wis. 2d at 692 (same). **Brown** states that "[t]he issue of the intended scope and legal effect of the releases involved in this case cannot be decided on the present record," which strongly implies that if, in another case, the language of a release were less ambiguous, summary judgment could be appropriate. *See* **Brown**, 88 Wis. 2d at 238. For the court in **Brown**, it was an impediment to summary judgment that the parties used varying language in multiple relevant releases, with some more closely resembling "true general release[s]" than others. *Id.* at 235-36. As a result of this, the court could not determine "whether the instruments were in fact intended by the parties to be general releases at all or something less than that." *Id.* at 236.

¶30 It is true that the court explains in **Brown** that the parties' intent regarding a meaning of a release "must be sought from the whole and every part of the instrument and from the surrounding conditions and circumstances." *Id.* at

234. But we interpret these propositions to be in line with other statements by our supreme court addressing contract interpretation in general, which call for holistic and contextual interpretation of all of the language within the four corners of the contract. This includes the proposition that contracts are to be construed "consistent with 'what a reasonable person would understand the words to mean *under the circumstances.*'" *See Tufail v. Midwest Hosp., LLC*, 2013 WI 62, ¶28, 348 Wis. 2d 631, 833 N.W.2d 586 (emphasis added) (quoting *Seitzinger v. Community Health Network*, 2004 WI 28, ¶22, 270 Wis. 2d 1, 676 N.W.2d 426). Thus, for example, in interpreting "a business contract," discerning a reasonable understanding can involve considering "'the manner that [the contract] would be understood by persons in the business to which the contract relates.'" *Id.* (quoting *Columbia Propane, L.P. v. Wisconsin Gas Co.*, 2003 WI 38, ¶12, 261 Wis. 2d 70, 661 N.W.2d 776). The Agreement here is unquestionably a business contract, one that seeks to resolve disputes and prevent further disputes between these parties, including all those involving past transactions between them.

¶31 Further, even if *Brown*, *Pokorny*, and *Plummer* were to be interpreted to stand for the proposition that releases can never provide a basis for summary judgment whenever a party disputes the scope of a release, our supreme court has left no doubt that this is not the case. In opinions post-dating those decisions, the court has made statements completely inconsistent with that proposition. *See Huml*, 293 Wis. 2d 169, ¶¶52-53 (explaining that the standard four-corners rule of contract interpretation applied to the terms of a settlement release of a civil action, based on the "sweeping words" and "global" nature of the release); *Town Bank*, 330 Wis. 2d 340, ¶33 (emphasizing the duration and force of the rule that freedom to contract depends on court constructions of unambiguously worded contracts); *Tufail*, 348 Wis. 2d 631, ¶¶24-32

13

(summarizing at length "basic principles" that apply to the interpretation of contracts). Under the more recent opinions, releases are not subject to special rules of interpretation that differ from ordinary contract-interpretation rules. This establishes that the legal standard that predates *Brown* (1979)—in such authority as *Peiffer* (1971)—remains in place. Thus, it has always been the rule that a release, a commonly used form of contract, is to be interpreted under the same rules that apply to other types of contracts.[5]

¶32     Summing up on this issue, we interpret the Agreement using the standard rules that apply to contracts. Under these rules, if the Agreement on its face is ambiguous on the topic of Hallick's right to claim an interest in the Fund, we may consider extrinsic evidence to determine the parties' intent on that topic, but only in order to decide whether there is a disputed issue of fact for consideration by a fact finder at trial. *See Energy Complexes, Inc. v. Eau Claire County*, 152 Wis. 2d 453, 468-69, 449 N.W.2d 35 (1989) (examining extrinsic evidence to determine that the intent of the parties to an ambiguous contract was in dispute, and therefore summary judgment should have been denied by the circuit

---

[5] The path has not always been clear. For example, considered in isolation, one could misinterpret a statement by our supreme court in *Brandner v. Allstate Insurance Co.*, 181 Wis. 2d 1058, 512 N.W.2d 753 (1994), citing *Brown v. Hammermill Paper Co.*, 88 Wis. 2d 224, 276 N.W.2d 709 (1979), for the proposition that "[t]he determination of the intent of the parties to a release is a question of fact and will be upheld unless clearly erroneous." *See Brandner*, 181 Wis. 2d at 1078 (citing *Brown*, 88 Wis. 2d at 234). But we interpret this statement to mean only that, when there has been a finding of fact regarding the parties' intentions in entering into a release, that finding is reviewed for clear error, and not that all issues of intent involving a release must always be submitted to a finder of fact. In *Marx v. Morris*, 2019 WI 34, ¶63, 386 Wis. 2d 122, 925 N.W.2d 112, our supreme court cited *Brandner*, 181 Wis. 2d at 1078, for the unqualified proposition that "[r]eleases should be construed to give effect to the intention of the parties," but the court then immediately restated the familiar rule of contract interpretation that courts rely on the language of contracts when its meaning is plain. This also supports our view that *Brown* does not represent a divergence from general contract interpretation law in Wisconsin, or if it does, then it has been implicitly overruled by our supreme court.

court).  But, if the Agreement is unambiguous on this topic, we do not consider extrinsic evidence.  *See Huml*, 293 Wis. 2d 169, ¶52.

## II.     On its Face, the Agreement is Not Ambiguous on this Issue

¶33     We begin by supplementing our overview of the Agreement above by reviewing in more detail pertinent language from the Agreement.  Then we explain why we conclude that the only reasonable interpretation of the Agreement on its face is that Hallick is precluded from ever claiming or demanding a right to enforce any interest in the Fund that was created by any transaction involving Hallick and the Debtors before the effective date of the Agreement.

### A.  Pertinent Agreement Terms

¶34     To repeat, the Agreement, which was executed by Hallick and the Debtors alone, provides for an "Effective Date" of June 1, 2021, and states that it "is entered into" on that date.

¶35     It contains two "recitals," which "are specifically incorporated into this Agreement."  One recital acknowledges that the Debtors "are indebted to" Hallick under the $13,625,000 money judgment.  The other recital states that the Debtors "have agreed to pay a portion of the Judgment on the terms provided below, and Hallick has agreed to withhold any actions to collect the Judgment from Debtors and release the Debtors from the Judgment if Debtors fulfill the terms provided below."

¶36     As referenced above, the Debtors commit to pay Hallick $5 million, on a specified payment plan, as a "settlement."

¶37    Most central to the analysis is the following portion of one paragraph, and we refer to this portion as the Hallick-release paragraph:

> Upon payment in full of the [$5 million] due under this Agreement, Hallick shall be deemed to release and discharge the Debtors, their attorneys, successors, and assigns (collectively the "Debtor Released Parties") from any and all claims, counterclaims, demands, actions, damages, causes of action[,] and affirmative defenses which Hallick has asserted or claimed, or may hereafter assert or claim, against any or all of the Debtor Released Parties, whether known or unknown, arising out of, related to, or in any [way][6] connected with or based upon the Judgment, the Action, the Lawsuit, the Collateral,[7] this Agreement, or any act, omission, circumstance, agreement, transaction, transfers, payment, event, or occurrence between or involving the Debtors, the Collateral, and all or any of the Debtor Released Parties, and which occurred prior to the Effective Date ….

¶38    Immediately following the Hallick-release paragraph is another paragraph that we will refer to as "the no-additional-releases paragraph," which states:

---

[6] It appears obvious that the word "way" is inadvertently dropped here through a scrivener's error, and the omission plays no role in our analysis.

[7] The "Judgment" is defined in the Agreement to be the $13,625,000 money judgment.

The "Action" is defined in the Agreement to be the civil action that resulted in the $13,625,000 money judgment.

The "Lawsuit" is defined in the Agreement to involve provisions that address the Debtors defaulting on their obligation to make all of the timely payments to Hallick. In that event, the Debtors authorized Hallick to file a lawsuit (defined as the "Lawsuit"), a draft of which was purportedly attached to the Agreement, and other documents to allow speedy enforcement of the Debtors' obligation to pay Hallick the $5 million.

Like the "Lawsuit," the "Collateral" involved potential default by the Debtors. One attachment to the Agreement was a security agreement in favor of Hallick identifying interests in three entities, which were collectively defined as the "Collateral."

16

> Other than the releases expressly provided herein, nothing in this Agreement shall be construed as a waiver, release, or relinquishment of any rights or claims, either known or unknown, which either party may have against any party, either now or in the future.

¶39    Both the Hallick-release paragraph and the no-additional-releases paragraph are contained in subpart number 11. of the Agreement, which bears the explicit heading, "Release."  Hallick does not develop an argument that, in themselves, any aspect of the formatting or overall structure of the Agreement limited or obscured the significance or meaning of these release provisions.  Instead, his arguments are centered on the specific terms that are used, or not used, in the Agreement.

## B.  Analysis

¶40    We now summarize in detail relevant terms in the Hallick-release paragraph, moving from top to bottom, before explaining our conclusion.

¶41    There is no dispute that the opening phrase of the Hallick-release paragraph establishes that the terms of this paragraph are triggered at the moment when the Debtors have paid Hallick all of the $5 million.  There is also no dispute that the Debtors satisfied this condition.[8]

¶42    The Agreement does not define "release and discharge"—which is contained within the longer phrase "Hallick shall be deemed to release and

---

[8] For ease of reference, we refer simply to the Debtors, even though the Hallick-release paragraph expands the scope of the release to include their attorneys, successors, and assigns. But, in using that shorthand, we do not mean to obscure the fact that, by including this larger set of interested parties related to the Debtors, the Hallick-release paragraph is in a significant sense forward-looking.  That is, Hallick would be giving up not only the ability to renew claims that he made against the Debtors in the past, but also any claims that he might make against them (and closely associated parties) in the future, as discussed in the text below.

discharge ... any and all claims," etcetera. But we do not discern a dispute about its meaning here. "Release and discharge" means that, through the Agreement, Hallick would be voluntarily relinquishing or conceding in favor of the Debtors his right to bring such claims, consistent with an apt dictionary definition. *See* BLACK'S LAW DICTIONARY (12th ed. 2024) (giving as one definition of "release," "The relinquishment or concession of a right, title, or claim.").

¶43    We now italicize what appear to be the relevant terms in the phrase that describes the types of recourse that Hallick releases: "*any and all claims*, counterclaims, demands, *actions*, damages, *causes of action*[,] and affirmative defenses." As shorthand in the discussion that follows, we will for the most part use the word "claim" to cover all of these meanings, but it is significant that this is expanded by the phase "any and all," and that this set of terms also includes "actions" and "causes of action."

¶44    Two phrases that follow are critical to our discussion below in explaining our conclusion. The release not only bars Hallick from pursuing against the Debtors any claims that he had already "asserted or claimed" against them, but also from pursuing against them any claims that he "may hereafter assert or claim," and further states that this includes claims both "known or unknown." The only reasonable construction of "known or unknown" would be that it would not matter whether any of the parties contemplated or could predict the potential claim at the time the Agreement was entered. *See Rensink v. Wallenfang*, 8 Wis. 2d 206, 213, 99 N.W.2d 196 (1959) ("If it is his [or her] intention to do so[,] a person may, by his [or her] general release, discharge a claim the existence of which is unknown to" the person); *id.* at 214 (stating that claims which "matur[e] or accru[e]" after a release is given may be precluded if it expressly contemplates precluding such future claims). As we discuss below, one significant weakness in

Hallick's argument on appeal is that he appears to ignore the phrases "or may hereafter assert or claim" and "whether known or unknown." *See **Maryland Arms***, 326 Wis. 2d 300, ¶45 (interpretation should aim to give meaning to every word in a contract).

¶45　　Next comes a set of four broad catch-all phrases that are used to set up two alternative categories of topics.

¶46　　The four broad catch-all phrases are: "arising out of, related to, or in any [way] connected with or based upon." As we discuss below, of particular note are the sweeping breadth of both "related to" and "in any [way] connected with."

¶47　　The two alternative categories of topics that are set up by the catch-all phrases are the following, and we use italics to highlight terms of particular note, as discussed below:

- "*[T]he Judgment*, *the Action*, the Lawsuit, the Collateral, this Agreement, or"

- "[A]ny act, omission, circumstance, *agreement*, *transaction*, transfers, *payment*, event, or occurrence between or *involving the Debtors*, the Collateral, and all or any of the Debtor Released Parties," "which occurred prior to the Effective date."

¶48　　Bearing in mind the comments that we have just made about the Hallick-release paragraph, we conclude that the only reasonable interpretation is that, once the Debtors paid Hallick the $5 million in full, Hallick would be barred from pursuing any of the remaining claims in the current action. Stated in terms of the Hallick-release paragraph, once the Debtors satisfied their obligation to pay Hallick in full, Hallick expressly relinquished his right to pursue:

- any claim, action, or cause of action

19

- that Hallick might make in the future against any of the Debtors (regardless whether, at the time of the Agreement, no party contemplated such a claim, action, or cause of action)

- if the claim, action, or cause of action is related to or in any way connected with either:

- (1) the judgment or the action that led to it; or,

- (2) any agreement, transaction, or payment involving the Debtors.

¶49    This creates a permanent contractual bar to claims by Hallick against the Debtors related to the action that led to the money judgment for $13,625,000, the money judgment itself, or any past transactions between these parties, which has the practical effect of extinguishing Hallick's substantive right to make a claim of interest in the Fund.

¶50    There can be no reasonable dispute about the fact that Hallick's current claims in this action that he maintains an interest in the Fund are claims that are, at a minimum, related to or in some way connected with the earlier action that he pursued, which resulted in the money judgment.  In the earlier action, Hallick's position and the relief that he sought involved his ownership interest in the Fund.  As noted above, he alleged that defendants, including the Debtors, mismanaged his investments in entities that included the Fund.

¶51    That is sufficient to bar Hallick's claims in this action.  But there can also be no reasonable dispute that Hallick's current claims are related to or in some way connected with agreements or transactions in which he paid to obtain his interest in the Fund, so long as they occurred before the effective date of the Agreement.  As the Debtors note, the word "transaction" is a broadly inclusive

word, which necessarily reaches many forms of interaction, including investments in an LLC. Thus, for example, Hallick's investment to create his membership in the Fund, which would be the basis of any claim he has in ownership of the Fund now, is a "transaction" to which his current claims relate.

¶52 Hallick describes the Hallick-release paragraph as "a boilerplate release clause." In using that description, Hallick apparently intends to suggest that it recycles formulaic terms from other sources that do not fit the circumstances here. But Hallick fails to support any such implication. The fact that the release language here is expansive to the point that it can reasonably be described as a "global" or "general" release between these parties—and therefore perhaps could be used with only slight modifications by other parties in other cases to create global or general settlements of legal disputes—does not nullify the ability of the Debtors to rely on this language in this case. Further, the Agreement states that its terms were negotiated with the assistance of legal counsel, and that it was "COMPLETELY READ" by the parties before execution.

¶53 It is true, as Hallick repeatedly emphasizes, that the Agreement does not specifically discuss his ownership interest in the Fund. In particular, he points out that the Agreement does not, in so many words, "'assign,' 'transfer,' 'reconvey,' 'surrender,' or 'redeem'" Hallick's interest in the Fund. In other words, Hallick contends that the Agreement excludes by omission the topic of property rights, such as the intangible right of an ownership interest in the Fund. It is also true that the Agreement does not actually or implicitly require Hallick,

upon his receipt of the $5 million, to take steps to dissociate from the Fund or to affirmatively surrender, relinquish, or transfer his units of ownership in it.[9]

¶54   But, interpreting the Agreement as written, the parties used language so broad that it essentially releases the Debtors from all manner of claims that Hallick could ever bring against the Debtors that are related in any way to his historical interactions with them.  Understood this way, this certainly includes any claims related to interactions between these parties involving Hallick's interest in the Fund.  The Hallick-release paragraph did not need to specifically call out claims to property rights, as opposed to other types of rights, because it stated clearly that it embraced *all* claims to rights of any kind between these particular parties during the relevant time period.  As noted above, our task is not to try to divine a subjective "meeting of the minds," but instead to objectively interpret the words used by the parties.[10]

---

[9] For this reason, we essentially agree with the first of the two points made in the dissent. *See* Dissent, ¶¶72-75.  Where we respectfully part ways is that, in our view, the dissent fails to come to grips with the fact that Hallick's ownership interest in the Fund unquestionably arose from his 2013 transactions with the Debtors, as we explain in the text.  The dissent simply asserts, without analyzing the terms of the Agreement or providing legal authority, that a claim based on the Debtor's position that Hallick no longer had an interest in the Fund "is not a claim based on the Judgment, nor is it a claim that is 'related to' or 'in any [way] connected with' acts or transactions that occurred prior to the Agreement's effective date." *See* Dissent, ¶80.

[10] Hallick does not argue that the Agreement must be reformed based on a mutual mistake of material fact related to Hallick's interest in the Fund. *See Gielow v. Napiorkowski*, 2003 WI App 249, ¶22 & n.6, 268 Wis. 2d 673, 673 N.W.2d 351 (applying mutual-mistake doctrine to a release).  In some cases, depending on the summary judgment materials, a mutual mistake defense to the enforcement of a contract could present an issue that must be submitted to a fact finder at trial. *See Hennig v. Ahearn*, 230 Wis. 2d 149, 177-78, 601 N.W.2d 14 (Ct. App. 1999) (whether party was entitled to reformation of contract involved fact issues for jury to resolve).  A contract may be reformed when it is shown that the parties were unaware of the existence of a past or present fact material to the contract. *Gielow*, 268 Wis. 2d 673, ¶22 (citing WIS JI–CIVIL 3072).  The alleged "unawareness or belief" at issue must have arisen "from a lack of knowledge of the possibility that the fact may or may not exist." *Id.*  But, if there was "conscious doubt or uncertainty" by the parties about "the existence or nonexistence" of the fact,

(continued)

¶55    Hallick relies heavily on the no-additional-releases paragraph, quoted above.  Hallick contends that, if the Hallick-release paragraph is construed as we do above, that would render "superfluous" the statement in the non-additional releases paragraph that, apart from express release language, "nothing in this Agreement shall be construed as a waiver, release, or relinquishment of any rights."

¶56    The no-additional-releases paragraph could create ambiguity if it were limited to addressing claims involving interactions between Hallick and the Debtors.  This could raise the prospect that it modifies the Hallick-release paragraph in some manner relevant to Hallick's ability to claim an interest in the Fund, perhaps requiring a trial to resolve ambiguity.  But the no-additional-releases paragraph is not so limited, and therefore it is not superfluous under our interpretation.  The no-additional-releases paragraph refers to claims that "either party may have against *any party*."  This stands in sharp contrast to the language used in the Hallick-release paragraph, which is limited to the liabilities discharged against only the Debtors (and closely associated parties).  Further, the Agreement elsewhere identifies a set of persons and entities as being the "Non-parties," and a set of entities as being the "Entities," in addition to providing that the Agreement is not intended "to provide any benefit to any third parties."  The Agreement also expressly states that the parties "do not intend, by this Agreement, to provide any benefit to any third parties."  For these reasons, the no-additional-releases paragraph serves the clear purpose of preserving Hallick's claims *not* related to the

---

then the parties are deemed to have intended "to accept and compromise the consequences of the doubt and uncertainty," and they did not enter the contract with a shared mutual mistake about a material fact. *Id.*

Debtors, which would not modify the otherwise unambiguous terms of the Hallick-release paragraph with regard to the Debtors in particular in the manner that we have described.

¶57 Hallick further emphasizes that the no-additional-releases paragraph refers to the release of rights as "expressly provide[d]" in the Hallick-release paragraph. He argues that the Hallick-release paragraph does not "expressly provide" that, upon full payment by the Debtors, he would be waiving, releasing, or relinquishing the specific right to claim an interest in the Fund. But, for the reasons we have explained, the Hallick-release paragraph *does* expressly provide that he would be relinquishing such a claim. As we have acknowledged, it does not do so by using terms that identify, in so many words, a surrender of Hallick's ownership rights. But it uses broad terms that unambiguously cover all claims of any kind related to or based on such rights. Hallick now fails to account for the fact that there would be no point in using the sweeping language in the Hallick-release paragraph if any claim that falls within its broad definition were to spring to life again under the no-additional-releases paragraph simply because the nature of that claim is not spelled out in detail in the Hallick-release paragraph.

¶58 And, as we have already explained, an evident purpose for the no-additional-releases paragraph does not, as Hallick would have it, contradict or modify our interpretation of the Hallick-release paragraph. Put differently, given the language that the parties otherwise decided to use, if they intended to reserve or carve out Hallick's interest in the Fund as a potential subject of a future claim, the parties could easily have done so in either the Hallick-release paragraph, the no-additional-releases paragraph, or elsewhere in the Agreement. Instead, the all-encompassing language of the Agreement does not reveal any intent to limit the scope of the claims precluded by Hallick against these particular parties.

¶59   Hallick relies on WIS. STAT. ch. 183, which is the Wisconsin Uniform Limited Liability Company Law, and the operating agreement of the Fund, to argue that, in the absence of formalities of a transfer of interest, the Agreement could not be construed as a transfer of his ownership interest in the Fund, which to repeat is an LLC.[11]   He also cites WIS. STAT. § 700.01(3), which defines the transfer of an intangible property interest such as an LLC ownership interest as an "instrument of transfer."   For example, Hallick specifically contends that the Agreement could not have cut off his ability to claim an ownership in the Fund because there is, in Hallick's words, "no evidence" that Hallick or the Fund took the steps stated in the operating agreement that governs the Fund to accomplish a transfer of a member's ownership units to another.   Further, Hallick notes, the operating agreement states that any transfer or attempted transfer that violates the operating agreement is deemed null and void.   As part of this argument, Hallick offers an analogy.   He asks us to imagine a hypothetical deed for real estate "that lacks an address, legal description, tax key number," and which is not recorded.   He asks how such a document could effectuate the transfer of a real estate interest.

---

[11] We observe that both sides on appeal ask us to take into account the operating agreement of the Fund in interpreting the Agreement on its face, even though the operating agreement is not attached to, or even referenced in, the Agreement.  Neither side explains how the operating agreement could be anything other than extrinsic evidence for purposes of interpreting the Agreement on its face.  Indeed, Hallick at one point in his briefing appears to explicitly treat the operating agreement as extrinsic evidence.  In any event, however, our analysis would be the same whether or not we consider the limited references that the parties make to the substance of, or the existence of, the operating agreement, for reasons that we explain in the text of this opinion.  Further, we see no basis to conclude that a reasonable party entering into the Agreement who was fully aware of, and took into account, all terms of the operating agreement related to ownership interests, redemptions, and transfers, would have reasonably construed the broad terms of the Hallick-release paragraph to carve out an exception for claims to enforce Hallick's ownership interest in the Fund.

¶60     But, unlike Hallick's hypothetical defective deed, the Agreement does not purport to be either an instrument transfer under WIS. STAT. ch. 183, nor a formal transfer of interest under the Fund's operating agreement. And, Hallick fails to cite any basis to conclude that the Hallick-release paragraph is nonetheless subject to the statutory or corporate governance rules for a formal transfer of interest. That is, Hallick does not identify authority from any source for the proposition that an owner of an interest in an LLC in Wisconsin cannot, as part of a settlement of civil litigation involving that ownership interest, release all claims of interest in the LLC through an agreement that is framed in the form of a release.

¶61     In contrast, we must apply long-established principles of contract law. *See* *Estate of Kriefall v. Sizzler USA Franchise, Inc.*, 2012 WI 70, ¶32, 342 Wis. 2d 29, 816 N.W.2d 853 ("We will not depart from the language of the contract, nor read language into a contract, when the language that the parties employed plainly states their intentions."). And, at least as a general matter, "fundamental principles of freedom to contract support the proposition that parties can subsequently contract to modify the terms of a previous contract," such as by "mutual agreement to change certain obligations" between the parties. *See* *Midwest Neurosciences Assocs., LLC v. Great Lakes Neurosurgical Assocs., LLC*, 2018 WI 112, ¶77, 384 Wis. 2d 669, 920 N.W.2d 767; *see also* *Marx*, 386 Wis. 2d 122, ¶¶20, 63 (LLC operating agreements, like releases, are contracts).

¶62     By logical extension, Hallick may mean to suggest that the parties here could not have intended to agree to his release of the types of claims that remain in this lawsuit because of the existence of the statutory or corporate governance rules for interest transfer. But he fails to call our attention to any provision in the Agreement that could support such an argument. Instead, on its face, the Agreement as a whole, and in particular through the Hallick-release

paragraph, appears to reflect a desire for Hallick and the Debtors, upon payment of the $5 million, to never again litigate any aspect of their past transactions. This would include any claim by Hallick for remedies for an alleged breach of the operating agreement.[12]

¶63 Hallick warns of "chaos" for LLCs and their owners under our interpretation. Chaos will follow, he argues, because "every limited liability company member in Wisconsin is at risk of unknowingly losing their LLC ownership rights." Hallick does not fully explain this idea, but it appears to amount to the following. If ordinary principles of contract interpretation are applied to litigation settlement releases that involve ownership interests in LLCs, this could pose unreasonable risks to LLC members who may not understand the consequences of proposed release terms. Yet such a risk would appear to be an inevitable consequence of Wisconsin contract law, and courts are obligated to apply that law to the contracts that parties agree to enter into.

¶64 Hallick also makes a point based on timing, although the point is not entirely clear to us.[13] He observes that his remaining claims in this lawsuit, all based on his alleged continuing ownership of an interest in the Fund, arose only

---

[12] For these reasons, we need not reach the dispute between the parties about whether, if the Agreement were considered to effect a formal transfer of interest under the operating agreement, it would in fact have complied with the Fund's operating agreement.

[13] The Debtors briefly assert that Hallick forfeited this particular argument by failing to present it to the circuit court. Assuming without deciding that the Debtors have articulated a potentially viable forfeiture argument, we exercise our discretion to disregard forfeiture. Our review is de novo on issues of law such as the ones presented here, the parties have had ample opportunities to brief all related issues in both the circuit court and on appeal, and the alleged forfeiture here does not involve appellate jurisdiction. *See State v. Counihan*, 2020 WI 12, ¶27, 390 Wis. 2d 172, 938 N.W.2d 530 ("The forfeiture rule is a rule of judicial administration, and thus a reviewing court may disregard a forfeiture and address the merits of an unpreserved issue in an appropriate case.").

when the Debtors took the position that he was no longer an owner, which occurred after the effective date of the Agreement. With that in mind, Hallick asserts that "[a] release drafted to bar claims arising from *past* events cannot be stretched to eliminate current status and ongoing statutory rights." (Emphasis in original.) Whatever Hallick means to argue on this point, it lacks merit for at least the reason that the Hallick-release-paragraph is explicitly forward-looking in one sense that we have explained: Hallick is barred not only from making claims against the Debtors that he had already "asserted or claimed" against them, but also from pursuing against them any claims that he "may hereafter assert or claim," including "known or unknown" claims. Therefore, as long as a claim involves a transaction between Hallick and the Debtors that occurred before June 1, 2021, it does not matter when Hallick were to make his claim.

¶65     Hallick asserts that the Hallick-release paragraph had no other purpose than to release the Debtors from their share of liability under the $13,625,000 judgment. This is without doubt a primary purpose reflected in the Agreement. For example, it is featured in the recitals that we have summarized. But the Agreement, and in particular the Hallick-release paragraph, has many other potential and actual effects, which cannot be ignored. *See Maryland Arms*, 326 Wis. 2d 300, ¶45 (courts avoid interpretations that would "render portions of a contract meaningless, inexplicable[,] or mere surplusage"); *Pulkkila v. Pulkkila*, 2020 WI 34, ¶26, 391 Wis. 2d 107, 941 N.W.2d 239 (courts should not "'read words into the contract that the parties opted not to include'" (quoted source omitted)).

¶66     Having decided that the Agreement on its face is unambiguous on the dispositive issue, we are not permitted to address the arguments of the parties involving extrinsic evidence.[14]     Notably, this includes Hallick's argument that depends on a comparison of the Agreement to the earlier settlement agreement between Hallick and the larger group of defendants.     As noted, this earlier settlement included an "equity transfer," under which Hallick would surrender his interest in the Fund, but which did not come to pass because the Debtors failed to make the full payment required by the settlement agreement.     The Agreement does not refer to the earlier settlement agreement.     Further, the Agreement contains a merger clause, stating that it "contains the entire understanding between parties with respect to the subject matter of this Agreement and supersedes any prior agreements, statements, representations, or understandings with respect thereto." *See **Town Bank***, 330 Wis. 2d 340, ¶39 (If a contract contains "an unambiguous merger or integration clause, the court is barred from considering evidence of any prior or contemporaneous understandings or agreements between the parties, even as to the issue of integration."). Therefore, we cannot consider Hallick's specific argument that it would be "absurd" to think that he would consent in the Agreement to walk away from his ownership interest in the Fund in exchange for $5 million based on the negotiation for $14 million in the earlier settlement agreement involving additional parties and different terms.

¶67     Instead, under the terms of the Agreement, Hallick and the Debtors expressly put all of their transactional history, and the results of that history,

_____

[14] Given our conclusion that the Agreement is not ambiguous on this issue in favor of the Debtors, we also need not address the Debtors' assertion in their appellate brief that Hallick has forfeited his alternative argument involving extrinsic evidence by failing to raise the argument in the circuit court. This could be at issue only if the Agreement were ambiguous on its face.

beyond the reach of any claim that Hallick might make in the future. For example, the Hallick-release paragraph includes "any act, omission, circumstance, agreement, transaction, transfers, payment, event, or occurrence between or involving the Debtors."

¶68 After the Debtors argue in their brief on appeal that Hallick did not literally transfer his ownership interest, but instead he released his ability to claim any ownership interest, Hallick's absurdity argument shifts ground. He asks, "How can one retain ownership but not be able to assert any ownership rights?" His answer is that this is not possible, because a right of ownership "is distinct from" a claim in litigation. But in the absence of any legal authority to support his position, Hallick's retooled absurdity argument amounts to an expression of regret that he consented to release, for all time, his right to make many types of claims, including any involving his ownership rights, because it would have been absurd for him to agree to the bargain that is struck in the Agreement. Put differently, we cannot interpret the facially expansive terms of the Hallick-release paragraph in a narrow manner in the absence of some textual signal or legal rule that would require such narrowing. Hallick fails to direct us to textual signals or legal rules that call for such narrowing.

¶69 As noted above, consistent with canons of contract interpretation generally, courts construing a release based strictly on its terms are to consider the totality of the release, what it reflects about the apparent context in which it was entered into, and how it would be reasonably understood by those engaged in the activities at issue. *See Brown*, 88 Wis. 2d at 231-35; *Tufail*, 348 Wis. 2d 631, ¶25. But these rules of interpretation do not help Hallick, because he fails to direct us to language in the Agreement that could support his argument. For example, and as we have already noted, the earlier settlement agreement that contained the

proposed equity transfer provision is not referred to in the Agreement. It is true that the "consideration given for a release is a proper factor for consideration when determining the scope of a release." *Gielow v. Napiorkowski*, 2003 WI App 249, ¶18, 268 Wis. 2d 673, 673 N.W.2d 351 (citing *Pokorny*, 51 Wis. 2d at 23-24). But Hallick's attempt to suggest that the Agreement on its face reflects that $5 million was not adequate consideration for the release of all claims, including his ability to claim an interest in the Fund, is completely unsupported by any aspect of the Agreement to which he now refers, even when we put to the side the fact that the Agreement states, "Each party hereto agrees that it has received sufficient consideration for entering into this Agreement."

## CONCLUSION

¶70 For all of these reasons, we affirm the circuit court's grant of summary judgment in favor of the Debtors.

*By the Court.*—Order affirmed.

Not recommended for publication in the official reports.

No. 2025AP1727(D)

¶71 GRAHAM, P.J. (*dissenting*). I agree with the majority that the Hallick-release paragraph is broad in scope, but I do not agree that its language unambiguously bars Hallick from bringing this action seeking a declaration that he retains an ownership interest in the Fund. On the contrary, I would be inclined to grant summary judgment in Hallick's favor, at least on the declaratory judgment claim. I reach this conclusion for two reasons. First, I conclude that nothing in the Confidential Judgment Payment Agreement (the "Agreement") extinguishes Hallick's ownership interest in the Fund, meaning that the ownership interest survives the Agreement. Second, I conclude that Hallick's declaratory judgment claim does not fall within the scope of the Hallick-release paragraph because the claim is based on actions that the Debtors took to deny his ownership interest after the effective date of the Agreement. To the extent that the Debtors are arguing that the Agreement effectively but indirectly eliminated his ownership interest—even though it did not literally do so—because it precludes him from asserting that interest in a legal proceeding, I would reject that interpretation of the Agreement as unreasonable.

I

¶72 With respect to Hallick's ownership interest in the Fund, Hallick obtained that interest as a result of capital contributions he made in 2013. According to the Fund's operating agreement, the ownership of the Fund is expressed in the form of units of ownership interest, and such units "have the incidents of ownership and rights and entitlements set forth in" an exhibit to the operating agreement. Generally speaking, ownership interests in limited liability

companies such as the Fund are governed by WIS. STAT. ch. 183 and the company's operating agreement.

¶73 The Debtors do not seem to be arguing that the Agreement actually extinguishes Hallick's ownership interest in the Fund. If the Agreement does extinguish that interest, it certainly is not explicit in doing so—as the majority acknowledges, Hallick's ownership interest is not mentioned anywhere in the Agreement. Majority, ¶53. There is no language in the Agreement that requires Hallick to dissociate from the Fund, or to surrender, relinquish, or transfer his units of ownership interest. Nor is there any language giving the Fund a right to redeem those units.

¶74 I also do not understand the Debtors to be arguing that the Agreement should be interpreted as implicitly extinguishing Hallick's ownership interest in the Fund. The focus of the dispute is on the Hallick-release paragraph, which addresses "any and all claims, … actions, … [and] causes of action" that address certain topics, including certain transactions involving the Debtors. Majority, ¶37. In my view, the ownership units themselves do not constitute a claim, action, or cause of action, as these terms are used in the Hallick-release paragraph. Thus, the release cannot reasonably be interpreted as implicitly requiring Hallick to dissociate from the Fund, or to surrender, relinquish, or transfer his units. Nor can the release reasonably be interpreted as implicitly authorizing the Fund to redeem those units.

¶75 For these reasons, I conclude that the Agreement does not itself extinguish his ownership interest in the Fund. Nor is there any suggestion that there was any other contemporaneous agreement that extinguishes Hallick's

2

ownership interest. Accordingly, I would conclude that Hallick's ownership interest survived the effective date of the Agreement.

II

¶76 The issue, then, is whether the Hallick-release paragraph bars Hallick from filing this action seeking a declaration that he maintains an ownership interest in the Fund. Hallick alleges that months after the Agreement was signed, the Fund sent Hallick a K-1 package that wrongly treated the settlement payment as if it had been a final distribution of Hallick's ownership interest. Majority, ¶15. That is, Hallick is alleging that the Debtors have been treating the Agreement as if it effectively extinguished his ownership interest in the Fund. In so doing, Hallick alleges, the Debtors are misconstruing the Agreement. Majority, ¶16.

¶77 Admittedly, the Hallick-release paragraph is broad in that it includes "any and all claims … which Hallick has asserted or claimed, or may hereafter assert or claim" that are "related to" or "in any [way] connected with" the Judgment or certain "act[s], … agreement[s], transaction[s], [and] payment[s] … which occurred prior to the Effective Date." I agree that, in light of the Hallick-release paragraph, Hallick cannot make a claim to recover the investment he made in 2013, or to recover his losses for alleged mismanagement of that investment, or to enforce any part of the Judgment.

¶78 However, as discussed, Hallick's ownership interest survived the effective date of the Agreement. I agree with Hallick's argument that his claim is based on the Debtors' post-Agreement denial that Hallick's ownership interest survived the Agreement, and the apparent post-Agreement steps the Debtors have taken to effectively redeem his ownership units. *See* Majority, ¶64. Therefore, in

3

my view, this claim is based on acts that occurred after the effective date of the Agreement, and it is outside of the scope of the Hallick-release paragraph.

¶79 In arguing to the contrary, the Debtors seem to be arguing that, even though the Agreement did not literally extinguish Hallick's ownership interest, that is the actual effect of the Hallick-release paragraph. *See* Majority, ¶68. That is, I understand the Debtors to be arguing that, because Hallick obtained his ownership as a result of an investment transaction that occurred in 2013, prior to the effective date of the Agreement, Hallick cannot bring a legal action to enforce the ownership interest he still maintains. As a result, the interest is effectively terminated, albeit indirectly.

¶80 If that is the argument the Debtors are making, I do not think that this is a reasonable construction of the Agreement. To repeat, the ownership interest survived the effective date of the Agreement. A claim that is based on the Debtors' failure to honor his existing ownership interest in the Fund is not a claim based on the Judgment, nor is it reasonably understood to be a claim that is "related to" or "in any [way] connected with" acts or transactions that occurred prior to the Agreement's effective date. I do not see any authority for the proposition that an ownership can be indirectly terminated in a broadly worded global release that fails to include any language requiring the owner to transfer that interest.

¶81 To the extent that there was a mutual understanding that Hallick's ownership interest would be terminated based on the Agreement, I would expect to see that understanding explicitly memorialized in clear terms, as it was in the parties' original settlement agreement. It may well be that in the negotiations that led up to the Agreement, the parties' minds did not meet on this point—perhaps

4

the Debtors entered into the Agreement based on the belief that it required Hallick to relinquish his ownership interest as part of the deal, and Hallick entered into the Agreement based on the belief that he was resolving old feuds but retaining his ownership interest. But even if the parties did not have the same subjective expectations, contract interpretation turns on the language of the contract. And here, in my view, the language of the Agreement is not reasonably susceptible to an interpretation that Hallick has given up the right to bring a legal action to enforce an ownership interest that survived the Agreement.

¶82 For these reasons, I respectfully dissent.